Good morning, if it pleases the Court. My name is Lawrence Murray. I'm here on behalf of the originally 35 deputies, now down to about 22 deputies that are suing. I wish to reserve some of the time for a co-counsel who's arguing the John Gray case. They're two together. And I want to cover two or three points that I'm not sure were properly illustrated in my brief. So if I could start with that. What we're talking about here is a room, County Jail 8, is a room that's probably twice the size of this room. In the room, there's a center with a pod for a deputy to work, and another deputy walks around. In those pods, there are sleeping quarters off in the back, and they're in, like, shelves. It's a circular building. There is a bathroom side, but the bathroom has, as I said, screens over it, privacy screens. If you're walking around or you're in the center of it, you can't see this. Yeah. What's your point? Well, many of the cases deal on privacy. Many of the concerns that courts have expressed are privacy, but all of those are taken care of here. There's four cameras in the ceiling that cover the entire place. Nobody showering is seen. Nobody that's in the and which has maybe been missed is that there's no realistic possibility that deputies walking around would see any untoward action, which is directly opposite of Rubino. In Rubino, there were six deputies that would stand there and watch women shower naked. That's not the case here. This case falls very close, if not on all fours, as the saying goes, to Brenner. This is about one place the operation of County Jail 8 in these pods. All of the other antidotal evidence comes from linear jails, which are completely different than what we have here. They come from incidents that occur when we have deputies transporting or taking male deputies, taking women out of the area. They do not occur in County Jail 8, yet that's the only place that this regulation has taken place. In fact, to this day, men still to the male deputies still take female prisoners outside and transport them to the hospital, transport them to court. They'd handle the other extenuating things such as the washroom. That washroom was where the alleged incident that was the one out of 16 years, the one incident, that was where it supposedly occurred. Nothing has changed there. The only change that has occurred is in County Jail 8, where there is cameras. There's approximately 80, sometimes as many as 100, other sets of eyes in there watching these people. But there is no realistic opportunity for any improper conduct to occur, but that's where the only place the regulation applies. The, you know, the case law seems all consistent. When red and light are of the privacy concerns and others, there is no opportunity for men to have untoward conduct towards female inmates. I might also note that in this context, there was no – there is only regulation of improper conduct by men. We put into evidence down in the trial court a number of instances where female officers had inappropriate conduct, inappropriate relationships, and developed – that's never been addressed by them. The city has never even taken a concern over that. It's only male. And I'm not disputing that it would be important to look at male, but it really, if the stated goal is to reduce inappropriate sexual conduct, it would be with everybody who would prey upon the inmates. Kagan. What additional evidence would, in your view, be required for the policy implemented by the Sheriff's Department to be entitled to this BFOQ defense? I may not look 62, but I'm having a hard time hearing you. I'm just curious, what do you think the Sheriff would have needed to show, then, to be entitled to the BFOQ defense? I mean, I think your Brenner decision suggests step-by-step what to do. Well, are you saying Brenner is directly on point? It can't be distinguished? Oh, I don't think Brenner can be distinguished in this incident, because Brenner really flows from the U.S. Supreme Court 1977 decision, Dobroff, which indicates there has to be a specific, direct connection between the regulation and the conduct that has to be addressed, and it can't be addressed on a stereotype. In Hawaii, the Rubino case, you got men looking in on the – on women showering. That's not stereotype. But here, what are we looking at? They have to prove, to answer your question more directly, under the case – the most recent case, Brenner, they have to prove that there isn't any man that can be trusted to work with, effectively, women. And we have 16 years of men in those cells, even in the worst situation, in the lineal cells, not the one where everybody can see, but in the one with the little sections, 16 years of that occurring, and they have – yes, they have allegations of wrongdoing, but they also have allegations of punching, they have allegations of all kinds of things. They have at least one – they say one, although the sheriff and the undersheriff did not recognize that and say that. They have one instance in 16 years. That is not the kind of case that was in Dobroff when the Supreme Court said, you've got violence, you've got physical violence going on all over this jail, we cannot ensure the safety of women coming in. In some of these other settings, we cannot ensure the safety of people working in there, so we can't – we can uphold those regulations. That's not the case here. How much difference, though, do we give to the sheriff? I mean, who's – they're 30 years who underwent this review, has a lot of experience, along with the undersheriff. I'm trying to figure out, does Brenner tell us how much deference, and if you could tell me what level of deference, because I think you're appealing the district court's order, and that's probably one of the reasons from what I can make of your brief. Brenner came out after the motion for summary judgment, so we went back and asked I know in the district court distinguished Brenner on all kinds of grounds. Yes, it did. But Brenner starts with the notion that the authority must look into a number of different options. They have to do a significant kind of inquiry. We have the women that are working in the jail cells, 22 of them, that were never talked to. We have the men that were working in those jail cells. They were never talked to. When you talk about asking them what they wanted, those are the people that stepped forward in this case, and each of them came forward and said, I can't work like this. This is dangerous. I have – we have instances, Maddie Morgan Spires. We have others that can't sleep. One of the women went to her doctor, the cardiologist, because she was having heart problems as a result of the kind of incidents that were going on in the jail, and she didn't have the backup. She didn't have the support. She didn't have the structure to protect herself. That's why 22 women came forward and said, there's a problem here, Mr. Murray. We need your help. This is not about just somebody saying, you know, we don't like what the sheriff did. The sheriff never came to and asked them. Somebody's jumping up and down here. I'm sorry. I have one more question. I'm sorry, before you step up here. Is this test more or less burdensome than some of the other tests that have been employed in the other circuits? Well, I think, first of all, it's all consistent with the U.S. Supreme Court 77 decision. All of the other circuits have talked about whether or not they're – the essence of trying to – this – of gender being the issue, consistent with is there any other way to look at it, et cetera. It is the central key issue that there is a strict liability test to it, a strict scrutiny test. I believe Judge Trout in 1979, 80, could have been later, at one point penned a decision on a rational basis test. This is not a rational basis test. This is not what the Supreme Court has said in that case and in other cases, that it's not whether or not you can agree or you can think that that person did a good job in thinking it through. You have to look at whether or not they explored all the other options, whether they talked to the people that were involved, whether they considered maybe training. Here we've got a ton of training that has never been done, and all of the experts indicate that training is a great way to solve any kind of inappropriate conduct. These people come to work. They have never been told about the inappropriate conduct between the maintaining boundaries, et cetera, et cetera. We put all that in declarations. Roberts. I have one question about one of the sheriff's justifications. He says that the male deputies are reluctant to supervise female inmates because of fear of complaints of I was groped, I was attacked, all that kind of stuff, and so they back off. In your view, is that a valid justification for being concerned about the way the jail functions? If I can give you two points on that, Your Honor. First, there isn't a specific instance they could point to that that happened. Second, and more importantly, it's no longer an issue when you have a camera looking down. If you have to take what they call hands-on, you've got to grab somebody and put them on the ground, you've got a camera watching you, you've got your other deputy watching you, you've got two people in a building down below watching you. There's no groping. Well, the other, your opponent's brief says at least some male plaintiffs admitted that they had such concerns when dealing with female inmates, citing the supplemental excerpt of record in very many places. Is that the case, that some of your plaintiffs? Some of them did testify that they were worried that their department would not back them up if they put their hands on a woman if they were accused of groping. So there is some, you know, I'm having trouble paying attention to the lawyer when you keep jumping up and down. You'll get your turn. So there is evidence in the record that that is a legitimate concern, that some of the male guards are worried about claims of sexual misconduct? There is a claim of them that their department would not back them up if they were innocent. That was the claim, as I recall it, that they had to work. Isn't that a significant consideration in dealing with who should be taking care of these inmates? Well, Judge, the question is whether or not we follow Brenner and some of the US Supreme Court decisions on point, which say it has to be a strict scrutiny test, and whether or not there's any other way of dealing with this. The department did step up. And this jail that was built with the cameras in it has addressed that, because now if a deputy goes hands-on with an inmate, they're going to have a record of what they did so that it's not groping. Is it in the record that these cameras cover every inch of this location, as you're suggesting? Not every inch. There's like maybe two feet or three feet that's a dead spot. But out of a couple of thousand square feet in each pod, all levels, the upper level and the lower level, is covered. If you prevail and we were to reverse this grant of summary judgment, what happens next? Well, there's a two-step process. Either you say that there is no BFOQ. The trial court and the defendant are going to be able to say that there's no BFOQ. Are you asking us for essentialists to grant summary judgment in your favor? I would love it. I'm not going to say that that's the only thing I want, because I would love to. If I have to go back and try this case, I'll be happy to try this case. But I don't think the other side has admitted we have made our discrimination case. The response is there is a defense to that discrimination case, and the defense is BFOQ. But they cannot, humbly, they cannot meet that defense. They cannot demonstrate that gender is a key factor that will only allow that jail to function adequately with women in it. In fact, we put tons of evidence in to demonstrate that. And they don't meet the test in Brenner. Again and again, each of the points that are brought up in Brenner are not addressed and are not followed. So my suggestion is I would love it not to have to try the case, but if I can, I will, one way or the other. Roberts. Thank you, counsel. Thank you. I'm sorry. Morning, and may it please the Court. Judge Trott, please accept my apologies for being distracted. You know, I mean, I understand why you were jumping up and down, but I'm trying to listen, and if somebody's doing that, it's hard to pay attention. I apologize for that. Not a problem. Go ahead. Going to your question about the record, about the evidence of deputies who were deterred or supposedly deterred because of fear of charges against them, actually what they cite to is the deposition testimony of Mr. Gray. It's on page 227 of the excerpts of record. And it's actually very interesting what they cite to, because Mr. Gray says that the inmates, this is on 226, actually, says that the inmates attempted to manipulate him by threatening to bring charges and, you know, saying things about harassment, et cetera. He says, I had nipped it in the bud. He says this was no problem. So what you've got is an indication that the inmates were attempting to do something, but that it wasn't successful. And there's no other evidence that there's any actualized problems from this sort of concern. You don't have any evidence of contraband. You don't have any evidence of violations of regulations. Nothing that would indicate that this is a significant problem, much less one that rises to the level that would satisfy a BFOQ. Remember what the Supreme Court said in Daughter and what this Court reiterated in the Brenner case. It said that the BFOQ is an extremely narrow exception, and it applies only when the essence of the operation would be undermined absent the gender-based classification. Well, as far as I read the record, during five years there were 12 claims of sexual misconduct between guards and inmates, and six of those were inmates at the location that we're talking about, CJ-8. Is that right? I don't think it's six, Your Honor. I think it's four. But I think what's really important about this, there's a concession that the city made, which is that none of these instances actually occurred within the pods. That's on the supplemental excerpts of Record 195. These all occurred in hallways and closets outside of the pod. And as Mr. Murray said, the pod is designed in a way that makes it nearly impossible to have any sexual misconduct there. Now, what's fascinating about this policy here is the policy prevents male officers from being the second deputy within the pod, but it doesn't prevent them from transport. It doesn't prevent them from being at the hospital where there was an atrocious rape in 2007. So it's not tailored to the actual problem that's indicated by the evidence. What do the two Federal lawsuits tell us? Well, one of the lawsuits was a sort of romantic, consensual relationship, which I don't think really helps the city at all. The second lawsuit, there's not much in the record concerning, and it's not clear that it was in CJ-8. I think the one thing you need to realize here is that the general practice, and this is undisputed, the general nationwide practice is to allow cross-gender staffing in female housing. That's what the State of California does in its prison system. That's what the Federal courts do, what the Federal prison system does. And in fact, there's a study by Zupan, I think Nancy Zupan, that says that's what 80% of all jurisdictions do. It's also what the City of San Francisco did between 1990 and 2006. Now, certainly, there were functions that were only performed by female deputies. You know, strip searches, pat-downs, going into the cells. Those were all done by female deputies. Those job responsibilities were manned by or staffed by female deputies. We're not challenging any of that. There were 22 posts like that? Twenty, 22, those are the numbers. It varies between the week and the weekend. What we're talking about is excluding male deputies entirely from the female housing units. And this is not connected to any specific responsibilities. These are based upon very generalized assertions like, you can't prevent sexual misconduct, upon privacy concerns, which are really taken care of by the privacy screens. So what we've got here, I think to answer Judge Murgia, your question, is this similar to what's going on in other courts? This is a much broader prohibition than has occurred in almost any other court, except for maybe the Everson case, which really had atrocious facts. I mean, that's the case in Michigan where you had literally decades of rampant sexual abuse, so bad that the U.N. Commission on Human Rights was investigating them. And they decided as a remedy for that, that they would have an all-female policy. There's no indication that that sort of extreme remedy is necessary in this case. And let me just point you to one other fact, which I think is really telling on this. Let me go back to you said, should there be deference? Well, Brenner says there should be some deference. This is in footnote 6 of Brenner. It says, some deference if it's the ‑‑ if the decision by the prison administrators is the product of a reasoned decision-making process based on available information and experience. Well, what do we know about the process here? Well, we know that ‑‑ because there was one management group in there that apparently screwed up. And so then it was taken back by the state, and the policy was immediately instituted. Yes, there was. But in our case, Your Honor, there was no study that was conducted. There was no survey, and I think there was a survey in Brenner. There certainly were surveys done in Everson and other cases. There were no interviews with line officers to see what they wanted to do, what they thought would be helpful. There was no consultation with academic literature, at least by the sheriff. There was no investigation of alternatives. He says that he didn't discuss any alternatives with the subordinates except for maybe cameras. So this was the thinnest of all possible studies that you could have. I don't think that's a reasoned decision-making process. Does it make any difference that this sheriff is ‑‑ I mean, this is not a Johnny come lately sheriff who's really a politician. This is a man who apparently at one point was in private practice and even sued for some of these kinds of things that we're talking about. Now he's been in position, well, you know everything about him from his deposition and otherwise probably more than I do. I mean, he's been involved in every aspect of the jail 30 years in office. I mean, this is not somebody who just dropped in 10 minutes ago and decided to change things. Well, Your Honor, you know, I would think if we're going to place this all on Sheriff Hennessey and say that, you know, the sheriff has been there 30 years, we should defer to him, I think you need to look and see what he did in June of 2008. Which is? That's when he went to the Candidates Forum. There was a deputy ‑‑ at the Deputy Sheriff's Association, they had a Candidates Forum. This is eight months after he instituted this policy. And at that Candidates Forum, he was asked a question which you would expect to get, which is, why can't males be the second deputy in the female hospital? And he didn't remember. No. He didn't ‑‑ he did remember. What he said, Your Honor, this is on page 426. Yes. What he said, I think, is incredibly important. What he said is he didn't have a problem with the second deputy being a male. Now, Brenner says you have to have something that is so important that it would undermine the essential function of the facility if you don't have a gender‑based distinction. Eight months later, Sheriff Hennessey is in front of the Sheriff's Association, and he's saying, you know, it's okay with me if you have males as the second deputy like we did for 16 years. Now, I would submit to you that a jury ‑‑ What's the second deputy? The second, remember, those are the extra four or six. Not the 20 to 22, you know, that are performing the strip searches and pat downs, you know, doing the responsibilities, which we're not challenging, should be only females. We're talking about the other four, you know, who don't have those specific responsibilities. That's the second deputy. That's the only thing that's at issue here in this case. He said he didn't have a problem with those four or six being males. Now, what he says is not that I made a mistake. It's that I misunderstood the policy, and I misspoke about the policy. But if that policy really was essential to the functioning of the facility, how could he possibly have mistaken that? And how could a reasonable jury not find, based upon that, that this policy was not necessary and doesn't meet the very stringent requirements of a BFOQ? Well, thank you, counsel. You're over your time, but we'll give you both some time for a bottle of water. Can I just say just very quickly, there's two things with respect to Mr. Gray. You know, one is this question under Rubino, whether there was an adverse employment action. I think he's shown that. He's shown that there was overtime that he was not eligible for because it was for females only, and that female sheriff's deputies who had less seniority than him were able to take that. So we think there's a genuine issue with respect to that. Rubino's off the table. And lastly, with respect to retaliation, we think he's shown a pattern of antagonism of that combined with the evidence of other sheriff's deputies who retaliated against this petition to raise a genuine issue. Thank you very much. Good morning. If it pleases the court, my name is Rafał Opierski, I'm a deputy city attorney, and I'm here on behalf of the city. And if it pleases the court, I would like to begin with a point that relates to all the discrimination claims here, and a point that's the, which I think is the prime reason why Judge Olson's judgment dismissing all those claims should be affirmed, and that is the fact that none of the plaintiffs who brought those claims, including the appellants who are here today, showed any harm from this policy at all. And I would like to address the two points that you just heard about from Mr. Gray's counsel, really the only two points that even make a semblance of any allegation of harm. One is the allegation, his claims concerning the alleged deprivation of overtime. What he really says in his declaration, and that's his only evidence for this point, is that he was unable to locate and unable to obtain overtime at places other than CJ-8 for the same date and time. Who are you talking about? This is Mr. Gray's declaration. Right. Okay. It's in the, Mr. Gray's excerpts of record on page 69, paragraphs 7 and 10. There are two reasons why this does not begin to show any actionable harm. One is, or is it? But harm is, it has to be de minimis. I mean, it's the barest of injury, isn't it? It seems like it's a very low standard. It may be a low standard, but there has to be some sort of harm. Sure, but wasn't there evidence that people had to take different shifts or half-hour daily commute would be affected, or losing a preferred regular day off for a month, or having to fill in for other people? It seems like it has to be just the injury can be almost anything. Well, the standard is not high, but there has to be some harm. And everything that relates to the issue of harm consists of these conclusively allegations. For instance, like the overtime allegations that Mr. Gray has made, and some of the other male appellants have echoed. So what he says in totally conclusively terms, I was unable to find any overtime at other facilities for the same time and date where I wanted to work at CJ-8. There are two problems with that. One, it's a wholly conclusively assertion. It lacks any specific facts, and that's a necessity. A party cannot survive summary judgment by just making these sorts of conclusively statements. And the second point is that it is very carefully crafted to say, I could not get overtime elsewhere at this specific date and time. And I think what Robino makes it clear is that there is no actionable injury in somebody's inability to have a shift or work at a particular date and time. So that's the overtime allegation. The only other allegation that Mr. Gray makes and other appellants echo that has any level of specificity to it at all, although not much and certainly not nearly sufficient, is the allegation about the nighttime watch selection. Mr. Gray claims that the nighttime watches were higher paid, and in the brief he suggests that he was denied the opportunity to select those watches. But again, when you look at his declaration, which is the only piece of the only allegation in the record that pertains to this point, what he really says is that in most cases, unspecified deputies with more seniority are affected. That's in the city supplemental excerpt of record in the Gray case at page 870, paragraph 49. So this is actually, this is nothing about Mr. Gray or any other specific appellant's injury. This is again a wholly conclusory statement that some deputies, in some cases, may have been denied this higher-paid shift. That's all there is in this case in terms of harm. And under Rubino, that's certainly not sufficient. And that's really the prime reason why Judge Olson's judgment should be affirmed, the absence of harm. Because under Rubino ---- Sotomayor, she barely references harm. I mean, she doesn't really go into harm. I think there's just a glancing reference of harm. Right. That's an argument that we presented and raised. She described her arguments as persuasive, but chose to ---- But doesn't really go into them. So I don't know how to ---- what that means for us with respect to that now. Well, there is still a record upon which we made this argument. I'm just questioning because you said based on what Judge Olson found, but I don't know that she considered that issue like the others. But let's move on to the other merits of this. And if you could, you know, how does Breiner not control here? Or Breiner. Breiner. I'm calling it Breiner, but maybe Breiner. Breiner is one of the two cases in this circuit that have addressed this issue. Rubino is one. Breiner is the other. And when you compare the two, Rubino is really just like an expanded memorandum disposition. I mean, I don't know how that analysis compared to Breiner. Would you say Breiner is more significant analysis? Breiner involves a more extensive analysis, but that gives us, I think, all the more opportunity to see that Breiner was nothing like this case. Let's begin with the justification, with the policy itself. In Breiner, the policy restricted the opportunity to seek promotion to a lieutenant position. And the justification for it was that if the lieutenants were women, they would be less likely to tolerate sexual misconduct by male guards against female inmates. So that just really made no sense. I mean, there was a, from the outset, there was a policy that was difficult to defend. If the problem was like it is, like it was here, potential or actual misconduct between the line staff and the inmates, then you do something about the line staff, not the supervisors. But doesn't Breiner tell us what we're supposed to look at any time you impose a discriminatory policy such as the one that's been imposed by the sheriff here? I mean, it's a pretty exacting test, is it not? It is an exacting test. It's certainly a harder test to meet than just the reasonableness test that would apply under Rubino in the absence of harm. But still, just to return to your question about the differences between Breiner and this case, not only was the Breiner policy completely illogical, it was also based on stereotypes. The policymakers who established the policy, one of the reasons for choosing it was that men, that women were more patient and more likely to succeed in these lieutenant jobs. The sheriff here never indulged in any stereotypes. In fact, ironically, it was consistently the appellants who tried to assert harm based on stereotypes. It's the appellants here who did the same thing that the decision makers in Breiner did when they say men are more prone to reason, women inmates are mildly. So it's really another critical distinction. The sheriff never indulged in any of these sorts of stereotypes. Another critical distinction was that in Breiner, the policy followed. Well, it seems like the sheriff does rely on some stereotypes in terms of how women act, how men would react. I mean, it seems like that was part of their justification in implementing its policy. I don't think so. I don't think that's correct, Your Honor. What the sheriff said, he said it in his declaration, he said it during the deposition, was that he never acted out of some belief, which the appellants tried to ascribe to him, that men are beings who can control himself. His view was, I have this problem, a documented problem, and there is no feasible way, despite of all we've done, the training, some of the cameras, the discipline, we still have not been able to rein in this problem. Well, let me ask you a question on that. Then the other side describes a location that's under the watchful eyes in material respects at all times of anywhere where something like this can happen. So what's the big deal? Now we have these surveillance cameras in here that eliminate all of these problems because the sheriff has control. Well, to look at the CJ8, the women's prison or the jail, we have to sort of be aware of two things. One, it consists of the pod itself, the open communal area with the two tiers of sleeping cells where the inmates mingle, the guards observe them constantly. It's certainly true that the possibility of any misconduct happening right there and there is unlikely, but that wasn't the sheriff's point. His point was, and this has to do with the fact that the jail also includes other areas that are shielded from view, that are private, for lack of a better word, the classrooms, the corridors, the hallways. And the dynamic that the sheriff was concerned about is exactly the dynamic that bore its ugly fruit in the Fernandez case, which is a case that we discussed in the record. And the facts there, they're undisputed, they're in the record in the form of the district court's order. And the factual findings were that in this open environment where although acts of misconduct may not take place right there and there, they enable the guards and the inmates to form improper contacts, improper relationships. That is followed then by the guards having the opportunity to take the inmates out of the pod, out of the public view, out of the camera's view to whether it's a storeroom or a laundry room or a classroom, and engage in improper conduct there. That's what happened in Fernandez. A deputy befriended an inmate when he saw her crying one day. They engaged in a secret relationship that involved the deputy and the inmate exchanging secret signals, communicating in secret. And then after a while, pardon me, the deputy, having established this relationship, took the inmate to a storeroom twice where they engaged in sexual activity. Eventually it was reported, the sheriff took action, the deputy resigned. But that illustrates the fact that while their argument is it's so open there's nothing you can do there, that's really not the concern, that's a red herring argument. The point is because of the close contact, the constant intermingling between the guards and the inmates, the direct jail supervision, while it offers great security benefits because of the constant observation and the opportunity for surveillance, it also provides the opportunity for guards who are willing to do that. And there always, there always been some, there always will be some, and it's impossible to weed them out. That allows them the opportunity to form the relationships which they then consummate elsewhere in other parts of the jail. I have another question. This comes to us on summary judgment. And summary judgment is the same as the judge saying if it were, I confronted with a 50A motion for judgment as a matter of law at the end of the case, I would grant it. Why isn't, it seems to me that this may be a classic case of there is a genuine dispute of material facts here. Why isn't this the kind of case that falls into that category and should go to a trial rather than be decided as a matter of law in summary judgment? Well, it's the same reason why Rubino, which was a summary judgment case, resulted in summary judgment in the government's favor and it was affirmed. At least when we're talking, and I'll get to the BFQ in a moment if I still have the time, but at least on the initial analysis, the harm inquiry, the facts really are undisputed. The record is what it is. And on those facts, just like this court did in Rubino, this court could do the same here and determine that there is no evidence here at all supporting any finding of harm. And if that's the case, then really the only remaining question is, does this policy serve, reasonably serve, some legitimate penological purpose? And if there was one argument, if there was one point that I could make about that, Your Honor, is that there is no question that preventing sexual misconduct, preventing sexual abuse of inmates is one of the most fundamental obligations of prison administrators, constitutionally and morally. And the crux of this case, to some extent, is the argument, their argument, that somehow the level of misconduct, the level of abuse must rise to some epidemic, catastrophic level before correctional officers are justified in taking some preventive measures. But that's interesting. But you don't have that policy across the board. You do allow male deputies to escort. I mean, there's like two or three other functions where you do allow the cross-gender to participate. Now, I'm trying to understand your argument that you just made. I mean, it sounds, you know, I appreciate, you know, the wanting to minimize or prevent the sexual possible misconduct or harm in any prison. But I don't understand, with this particular position, how is that different from the others where you do allow the cross-gender? Well, there are only really two instances that are in the record. One is in the medical pod. And the sheriff explained that the reason why male deputies are allowed in there is because there's always medical staff present there. So the concern about improper relationships either being consummated there or taking root there is very unlikely. The second context is the transport. These are very brief assignments. The department has protocols in place aimed to ensure that nothing untoward happens during these short transportation details. The time log is one of those things. So these, and this is why, this is another really piece of evidence that shows the sheriff's careful deliberation. You say short. I don't know what short means. I'm sorry? You say short. I don't know what short means. I misspoke. You said this is short? I was not following you. I beg your pardon. I misspoke, Your Honor. What I'm trying to say, this is another piece of evidence that shows the sheriff's deliberate consideration and calibration. I thought you said these were short assignments or something like that. Oh, yes. The transport, they're very brief. What does very brief mean? Well, I mean, 40 minutes in New York City, very brief is 10 seconds, 40 minutes. I mean, what do you mean short? There's nothing specific in the record. But to give an example, they would be transporting the inmate from the jail down on Bryan Street to the courthouse on McAllister. Or it would be transporting the prisoner from the jail on Bryan Street to the San Francisco General Hospital. Is it transporting him from San Francisco to prisons around the state? That is not in the record. I don't think so. But I can say for sure, because it wasn't that specifically identified. Typically, at least, these transport assignments are to and from the courthouse, to and from the hospital. Intra-county, in other words, city. Right. We don't know whether they're taking him to Chino or other places around the state. It's not a record. And I can't say categorically that that's not the case. But I don't think so. So just returning to the point about the justification of the policy. The law has never been that there has to be some critical level of sexual abuse and misconduct before a prisoner or a prison administrator can take action, particularly in the context of a situation where, like in Rubino, the restriction is minimal and it results in no detriment to terms of employment, whether it's pay. You bring to our attention some new federal regulations. And what value do you think those are to us and to this case? There are several points where this new regulation matters. One is it confirms what Sheriff Hennessey always thought, which is his job was to adopt a zero-tolerance policy and to strive, at least to the extent practicable, to eliminate sexual abuse. And what this regulation implementing congressional mandate does, it essentially vindicates his position. It seems under the current law, though, it seems like the zero-tolerance would have been explored as an alternative before imposing this very discriminatory policy that's imposed. And it doesn't appear from the record that the zero-tolerance policy was tried or considered before implementing this policy. So I appreciate it was sort of ironic in getting that reg and looking at the zero-tolerance policy because it seems like that should have happened first. Well, I respectfully disagree with you, Your Honor. And I think that's the another critical distinction between this case and Briner. Briner was a situation where there was no training at all. That's not the case here. Briner was a situation where sexual misconduct was permitted to flourish, essentially. Briner was the case where there was no one investigated. But in Briner, and I'm sorry to interrupt, but I want to make sure I understand your position. In Briner, there was an incident of an officer impregnating an inmate, if I'm correct. Here, there's one, even though there's a number of allegations, there's only one proven allegation of an officer and an inmate doesn't involve impregnating the inmate. And in Briner, it's said that you can't have that discriminatory policy. And here, you're saying should be able to have that discriminatory policy, even though that conduct seems to have been more severe in Briner than it was here. Well, two quick points in response to that. First of all, I don't think the Briner decision depended on the severity of the conduct. I mean, there was a rape in the record, but there were other incidents. And I don't think Briner should fairly be read that it's only this type of extremist conduct that justifies a response. And two, the record in this case, despite what you've heard to the contrary, is more extensive. It wasn't just this one case. It wasn't the Fernandez case that I talked about. There were 12 incidents in a six- or seven-year period preceding the policy. Some could not be proven one way or the other because they're often just a matter of one person saying one thing and another saying another. Did the sheriff have or did the sheriff not have a zero-tolerance policy before putting these new rules in place? Well, I think it was always his goal, and that's what he said in his deposition when questioned about the extent of misconduct that he was willing to tolerate. He said even one incident is enough. And really, the Fernandez case, as he testified in his deposition, was the case that finally brought him to the realization that there was a problem which, despite all the training and all the investigations and all the other measures that he had taken, was not going away, and that really the only way to reach his goal of, if not eliminating this problem completely, then at least reducing it as much as humanly possible, was to do what he did. So, again, this is a completely different situation from Briner, where the prison authorities adopted a policy which really made no sense in the first place, as I said, without any of these intermediate steps, without any investigations, without any prior efforts to rein it in, without any consideration at all. I know my time is up. Roberts. Thank you, counsel. Thank you. Mr. Murray, I will give you a ---- Well, no, rather, counsel, because we talked about this yesterday. All right. Mr. Bromberg, you abused your time before, so I'm going to give you two minutes. Before you begin, though, I have some ---- Judge Trott, first of all, as far as zero tolerance, there was no zero tolerance policy. I have a question. I have a question. I asked earlier about one of my concerns, and that is the fear that male deputies might have because of false misconduct allegations against them. And your colleague told me pretty much that the record was devoid of any suggestion of that, except for maybe a gray deposition, which was explained. But if you look at the decision here of the judge, she says not only ---- she references this. She says it starts with the Hennessey Declaration and then goes to the Dempsey Declaration, but then she says several plaintiffs echoed these explanations during their depositions. The gray deposition, female inmates have accused him of making a pass on six occasions. Jones deposition, concerned about accused of sexual misconduct. Keaton deposition, sometimes felt she was carrying all the weight when working with a male partner in a female pod, worked with male partners who didn't want to go out and be part of the female area because they're afraid that a female might say something about them. Flynn depositions, many female deputies, including the deponent herself, felt they ended up doing more work because of this problem. And then she cites the Everson case, which observed that many male officers afraid of false accusations of sexual abuse become gun shy and fail to monitor and discipline inmates in a proactive fashion. So I see considerable stuff in this record that supports Sheriff Hennessey's concern about this. And then she says, standing alone, this is one thing, but when you meld them into the security concerns, then it becomes something else. So does not this record contain substantial information that this is a valid concern? Your Honor, we've never suggested that this isn't a valid concern. Well, I got the impression that that's what your side was saying when I asked the question before and was told there wasn't anything like this in here. Well, I think, Your Honor, the point that we were making is, first of all, that this doesn't rise to the level that would satisfy a BFOQ. But even if it did, Your Honor, there's contrary evidence in the record. So this is a, at best, raises a disputed issue of fact, which should be tried at summary judgment like it was, should be determined at trial like it was in the Torres and the Everson case. This is certainly not a case in which you can allow this sweeping policy to be adopted without even being tested at trial. Now, just to go to your question about the zero tolerance, there is no zero tolerance policy prior to the adoption. If you look at page 495 and 496 of the excerpts of record, you'll see the two of the deputies that were found to have engaged in sexual misconduct were allowed to continue. They weren't even given extra training. And as far as training is concerned, that's something that the Department has never attempted. Sheriff Dempsey admitted that they have no training with respect to female inmates, no gender-based training, much less training that is focused on the interaction between male guards and female inmates. You have that training in state prison, California state prisons. You have that training in federal prisons. And by the way, as long as we're talking about the DOJ regulations, we're not going to get anywhere. Take a look at section 115.31, which is employee training, subsection A-5, training on the dynamics of sexual abuse and sexual harassment in confinement, subsection 8, how to avoid inappropriate relationships with inmates. Clearly, the Department of Justice thinks that these are effective things. They haven't even been tried by the city. And I think that's indicative of the problem here. There were no alternatives that were tried, that were even discussed before this sweeping policy was adopted. That is simply not enough. It doesn't satisfy, Judge Murgay, the standards that Brenner requires. I have a question regarding injury, because it looks like that is an issue being made at this point on whether or not there was harm and whether or not that is dispositive. Well, Your Honor, so first of all, you have the male guards. And I think with respect to Mr. Gray and the other male guards, that overtime answers that question. There's no dispute that overtime in the pods was limited to female only. Mr. Gray specifically says that. Now, Mr. Ofersky says, well, look, there wasn't you know, he didn't give us, you know, specific dates on which these things occur. But I think, I submit that if you look at page 96, you look at paragraphs 5 through 10, that's sufficiently detailed to raise a genuine issue. Mr. Gray said there were posts that were available only to females. They were taken by females with less seniority than me. As a result, I wasn't able to get the overtime that I might have. Now, Mr. Ofersky also says that the females ---- Any further questions? Sorry? Any further questions? Okay. Thank you, counsel. Thank you.
judges: Trott, Thomas, Murguia